**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| APPEAL OF J.C., FATHER | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3656 EDA 2018 |

Appeal from the Order Entered November 14, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000248-2018,
CP-51-DP-0002422-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: R.C., A | : | IN THE SUPERIOR COURT OF |
| MINOR | : | PENNSYLVANIA |
| APPEAL OF J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3658 EDA 2018 |

Appeal from the Order Entered November 14, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000249-2018,
CP-51-DP-0002421-2017

BEFORE:   OLSON, J., STABILE, J., and STRASSBURGER*, J.

MEMORANDUM BY OLSON, J.:                          **FILED AUGUST 1, 2019**

J.C. ("Father") appeals from the decrees dated and entered on November 14, 2018, granting the petitions filed by the Philadelphia Department of Human Services ("DHS" or the "Agency"), seeking to involuntarily terminate his parental rights to his minor children, R.C., a female born in September of 2012, and  J.C. a/k/a J.C., II, a male born in March of

---

\*   Retired Senior Judge assigned to the Superior Court.

2014 (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.

§ 2511(a)(1), (2), (5), (8), and (b),[1] and the orders changing the permanency

goals for the Children to adoption pursuant to the Juvenile Act, 42 Pa.C.S.

§ 6351.[2, 3] Father's counsel, Attorney Joshua Weil ("Counsel"), has filed with

---

[1] The trial court noted that its termination decrees incorrectly provided that 23 Pa.C.S. § 2511(a)(4) was a basis for the termination of Father's parental rights, but the court later amended the termination decrees on March 5, 2019. **See** Trial Court Opinions, J.C. and R.C., 3/15/19, at 1 n. 2.

[2] The trial court explained that A.M.G. a/k/a A.C.-S. ("Mother") voluntarily relinquished her parental rights to the Children, and that she has not filed a notice of appeal with regard to those voluntary termination decrees, nor is she a party to the present appeals.

[3] Here, Father filed his two notices of appeal on December 14, 2018. Father filed one notice of appeal with regard to each child, and each notice of appeal challenged both the termination decree and the goal change order with respect to that child. On January 10, 2019, this Court, acting *sua sponte*, consolidated Father's two appeals. On January 11, 2019, this Court issued rules to show cause to Father with regard to whether he violated the mandate of Pa.R.A.P. 341, as expressed in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), because he did not file a separate notice of appeal from each decree and each order as to each child. On January 21, 2019, Father filed his response to the rule to show cause. We discharged the rule on January 22, 2019. We will not penalize Father for his procedural misstep. **See In the Matter of M.P.**, 204 A.3d 976 (Pa. Super. 2019) (stating that **Walker** compels quashal when an appellant files a single notice of appeal from orders entered on two separate trial court dockets; however, to the extent decisional law may have been unclear to this point the Court did not quash the appeal). The **Walker** decision applies to appeals filed after June 1, 2018. The notice of appeal **In the Matter of M.P.** was filed August 17, 2018. The facts herein are analogous to **In the Matter of M.P.** Specifically, Father has filed one notice of appeal as to each child, and each appeal is from a termination decree and a goal change order, two separate trial court matters with separate docket numbers. Indeed, for both children, the decree terminated Father's parental rights to the child and was entered on the child's adoption trial court docket, and the order changed the child's goal and was entered on the child's dependency trial court docket.

- 2 -

this Court a motion for leave to withdraw as counsel and a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967). We grant Counsel leave to withdraw and affirm.

The trial court fully and accurately set forth the procedural history and factual background of this appeal, based on the testimony at the evidentiary hearing on the termination petitions held on November 14, 2018, in its separate opinions entered with regard to each child, which we incorporate in full herein. *See* Trial Court Opinions, J.C. and R.C., 3/15/19, at 1-4. Notably, the trial court stated:

> Children have been in DHS care since September 7, 2017. Father has failed to comply with his objectives and comply with court orders throughout the life of the case. DHS filed petitions to involuntarily terminate Father's parental rights and change Children's permanency goal to adoption on March 27, 2018.
>
> * * *
>
> On November 14, 2018, the trial court held the termination and goal change trial for [Children]. Father arrived late for this trial. Marilyn Rigmaiden-Deleon, Esq., was appointed as legal counsel ("Legal Counsel") to Children.

Trial Court Opinions, J.C. and R.C., 3/15/19, at 3.

---

In *M.P.*, filed on February 22, 2019, this Court directed that, all parties seeking review with this Court shall file notices of appeal as mandated by Pa.R.A.P. 341 and *Walker*, and that failure to comply would result in quashal of the appeal. As Father's appeals in this matter were filed prior to the filing of *M.P.* on February 22, 2019, however, we will not quash his appeals.

In addition to Attorney Rigmaiden-Deleon, Attorney Janice Sulman was present at the hearing as guardian *ad litem* ("GAL") for the Children. Also present at the hearing were: Attorney Weil, Father's counsel; Attorney Deborah Fegan, Mother's counsel; and Attorney Bennette Harrison, DHS counsel. DHS presented the testimony of Caitlyn King from Children's Crisis Treatment Center, ("CCTC"), who provides trauma-focused therapy for R.C. N.T., 11/14/18, at 16. DHS next presented the testimony of Danielle LaClaire from CCTC, who is a trauma clinician providing services to J.C. in the therapeutic nursery at CCTC. *Id.* at 42-44. DHS then presented the testimony of Giovanni Antoine, who is the Community Umbrella Agency ("CUA") Catholic Social Services worker assigned to the Children. *Id.* at 58-59. DHS finally presented the testimony of Father as on cross-examination. *Id.* at 87-88. Father testified on his own behalf. *Id.* at 99. The GAL presented the testimony of Genard Whitman, who was the CUA caseworker assigned to the Children's case prior to Giovanni Antoine. *Id.* at 126-127. Legal Counsel for Children presented the testimony of Tiesha Cooper, from Catch, Incorporated, who is the case manager for J.C. *Id.* at 143.

The trial court summarized its decision as follows:

Legal Counsel reported to the trial court that Children indicated that they wanted [to] remain with their current foster parent and did not want to return to Father. (N.T. 11/14/18, pgs. 144-145). The trial court found clear and convincing evidence to change the permanency goal to adoption and to involuntarily terminate

Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

Trial Court Opinion, J.C. and R.C., 3/15/19, at 3-4.

On December 14, 2018, Counsel filed this appeal on behalf of Father, including a concise statement of errors complained of on appeal with each notice of appeal. Thereafter, on April 29, 2019, Counsel filed in this Court an **Anders** brief on behalf of Father, along with a motion to withdraw as counsel.

Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw representation, he or she must do the following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . ., counsel has determined the appeal would be frivolous;
>
> (2) file a brief referring to anything that might arguably support the appeal. . .; and
>
> (3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed **pro se**, or raise any additional points he deems worthy of the court's attention.

**In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted).

In **In re V.E.**, 611 A.2d 1267, 1274-75 (Pa. Super. 1992), this Court extended the **Anders** principles to appeals involving the termination of parental rights. "When considering an **Anders** brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw." **In re S.M.B.**, 856 A.2d at 1237.

In **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009), our Supreme Court addressed the second requirement of **Anders**, *i.e.*, the contents of an **Anders** brief, and required that the brief:

(1)     provide a summary of the procedural history and facts, with citations to the record;

(2)     refer to anything in the record that counsel believes arguably supports the appeal;

(3)     set forth counsel's conclusion that the appeal is frivolous; and

(4)     state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361. "After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

With respect to the third requirement of *Anders*, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Counsel has complied with each of the requirements of *Anders*. Counsel indicates that he conscientiously examined the record and determined that Father's appeal is wholly frivolous. Further, Counsel's *Anders* brief comports with the requirements set forth by the Supreme Court of Pennsylvania in *Santiago*. Finally, we observe that Counsel did not attach

to his motion to withdraw a copy of any letter from Counsel to Father in compliance with **Millisock**. Counsel was required to state in the letter Counsel's intention to seek permission to withdraw, and advise Father of his right to retain private counsel to represent him on appeal or to file a *pro se* brief on his own behalf to raise any additional issues he deems worthy of appellate review. In his motion to withdraw, however, Counsel stated:

> Counsel has already informed [Father] in person and telephonically that [C]ounsel believes that the appeal has no merit and that [C]ounsel is moving to withdraw[,] and that whether or not the Court grants the [Motion] to [Withdraw], [Father] has the right to represent himself and to participate in the appeal or to hire [a] private counsel.

[Motion] to Withdraw, at 1 ¶ 4.

In its opinion, the trial court stated:

> Father has indicated to the CUA case worker [sic] [Mr. Antoine] that he resides in Pennypack Park, a public city park in Philadelphia. (N.T. 11/14/18, pgs. 59-60, 86). At the bar of the court, Father indicated that he does not live in Pennypack Park, but that he lives on a "concrete slab" with no mailing address. (N.T. 11/14/18, pg. 88). Father has indicated to the CUA case manager that he had no intention of presenting to the ARC [Achieving Reunification Center] for housing because he claimed that he did not need this program. (N.T. 11/14/18, pg. 63). CUA has attempted to assist Father with obtaining housing throughout the life of the case. [*Id.* at 84.] The CUA case manager offered to provide Father with a referral to a shelter program, but Father voiced his distaste for shelters. [*Id.* at 90-91.] Father indicated that the CUA case manager offered to refer him to a shelter, but Father chose not to follow up on that referral. (N.T. 11/14/18, pgs. 90-91, 111-112). Father is aware that housing is one of his objectives. (N.T. 11/14/18, pgs. 65-66, 110). Father has been offered appropriate resources to assist him in obtaining appropriate housing but, [sic] Father has not completed his housing objective because he has been unwilling to comply with his objective. (N.T. 11/14/18, pgs. 67, 69).

Trial Court Opinions, J.C. and R.C., 3/15/19, at 7.

On cross-examination by DHS counsel, Father testified that he does not have a mailing address but he has a working telephone number on which he has received calls related to the Children's case. *Id.* at 85-86. When questioned by the trial court concerning his lack of an address, Father stated to the court that, if anyone has anything related to the Children's case to give him, the person could call him on the telephone, and he would meet the person at a Burger King near Bustleton Pike and Street Road. *Id.* at 106-107. Mr. Antoine testified that Father never provided a valid mailing address to the CUA. *Id.* at 59. He stated that the CUA had been using Father's working cellular telephone number throughout the duration of the case. *Id.* at 59, 62. Additionally, Ms. Cooper testified that Father never provided an address to Catch. *Id.* at 142.

Here, Father has no address and is resistant to residing in a shelter, but has a working cellular telephone number that has been used in relation to the Children's case, and he has requested to be contacted in that manner. Accordingly, under the unique circumstances of this case, we find that Counsel has complied with the procedural requirements set forth in *Millisock* by communicating in person and over the telephone the required information set forth in *Millisock*. Moreover, Counsel has complied with the requirements set forth in *Anders/Santiago* for withdrawing from representation. We will grant

Counsel's motion to withdraw, and proceed with our review of the merits of Father's appeal.

In the **_Anders_** brief on appeal, Counsel raises the following issue:

## THE GLOBAL QUESTION

Whether there is anything in the record that might arguably support the appeal that obviates a conclusion that the appeal is frivolous[?]

## SPECIFIC AREAS OF INQUIRY

Whether under the Juvenile Act, 42 Pa.C.S.A § 6351, and 55 Pa.Code § 3130.74, in accordance with the provisions of the federal Adoption and Safe Families Act, 42 U.S.C. § 671, _et seq._, reasonable efforts were made to reunite the father with his children[,] whether termination of his parental rights were the dispositions best suited to the safety[,] protection[,] and physical, mental, and moral welfare of the Children [?]

Whether it was proven by clear and convincing evidence that Father's parental rights should be terminated under § 2511(a)(1), (2), (5), (8), and (b).

Whether the trial court committed reversible error when:

(a) it misheard and misinterpreted bonding evidence;

(b) it concluded there was a nexus between Father's transience/financial instability and an inability to parent; and

(c) it determined that with further assistance, Father would not have been able to remedy the dependent issues[?]

*Anders* Brief, at 5.[4]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon

---

[4] Father potentially waived any challenge to the goal change by his failure to directly raise the issue in his concise statement of errors complained of on appeal and in his statement of issues involved in his brief. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal); *see also M.Z.T.M.W.*, 163 A.3d 462, 466, n. 3 (Pa. Super. 2017) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal). However, this Court has stated, "[o]nce counsel has satisfied the above requirements [for a motion to withdraw and *Anders* brief], it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa. Super. 2007) (*en banc*), *quoting Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa. Super. 2004); *see also Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015) (following *Goodwin*). Thus, as part of our independent review we may address whether DHS established the grounds for a change in the permanency goal of the Children to adoption under section 6351 of the Juvenile Act.

demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained: "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.*, *quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will

consider section 2511(a)(2) and (b). Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

 **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence

- 12 -

necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

With regard to section 2511(a)(2), the trial court stated as follows:

Throughout the time that Children have been in the custody of DHS, Father's SCP objectives were to attend the CEU for drug screens and an evaluation, mental health, housing, employment, and supervised visitation. (N.T. 11/14/18, pgs. 61, 63, 68, 137). Father's objectives have remained the same and Father has attended most hearings. (N.T. 11/14/18, pgs. 65, 89, 100). Father had a scheduled assessment at the CEU on October 31, 2017, but Father failed to attend. Father's drug and alcohol screen was negative on October 10, 2017. (N.T. 11/14/18, pg. 13; DHS Exhibit 3). Father has not completed any random drug screens

- 13 -

throughout the case. The CUA case manager testified that during the life of the case, Father was asked to complete random drug screens, but he never complied. (N.T. 11/14/18, pg. 141). When the CUA case manager spoke with Father about completing random drug screens, Father indicated that he did not want to travel to Center City Philadelphia to complete the drug screens. (N.T. 11/14/18, pgs. 68-69). Father admitted that he did not attend the random drug screens, citing lack of funds and stating that he has never used drugs. (N.T. 11/14/18, pgs. 89, 100-101, 111). Father admitted that he never asked for transportation assistance to attend the random drug screens. (N.T. 11/14/18, pg. 101). Father acknowledged that he knew that the trial court ordered him to complete random drug screens. (N.T. 11/14/18, pgs. 100, 110). Father has not provided any verification that he has complied with any mental health assessment or treatment. (N.T. 11/14/18, pg. 68). Father was aware that the trial court ordered him to complete a mental health evaluation. (N.T. 11/14/18, pgs. 93, 110). Even though CUA and DHS discussed the mental health evaluation with Father on multiple occasions, Father admitted that he never received an evaluation. (N.T. 11/14/18, pg. 93). Father indicated that he received a mental health evaluation when he lived in Kentucky before this case began, but stated that he lost all of his paperwork reflecting that information. (N.T. 11/14/18, pg. 94). As part of Father's objective to receive mental health treatment, Father was ordered to engage in public assistance and receive a state identification card. Father never visited the public assistance office and does not have a state identification card. When asked if Father had any plans on visiting the public assistance office or obtaining a state identification card, Father stated that he would do so "later on down the road." (N.T. 11/14/18, pgs. 92-93). Father's failure to engage with public assistance is a barrier to Father's ability to receive mental health services. There are still concerns regarding Father's significant mental health issues. (N.T. 11/14/18, pg. 55). Father has not completed his drug and alcohol or mental health objective. (N.T. 11/14/18, pg. 69). Father has indicated to the CUA case worker [sic] that he resides in Pennypack Park, a public city park in Philadelphia. (N.T. 11/14/18, pgs. 59-60, 86). At the bar of the court, Father indicated that he does not live in Pennypack Park, but that he lives on a "concrete slab" with no mailing address. (N.T. 11/14/18, pg. 88). Father has indicated to the CUA case manager that he had no intention of presenting to the ARC for housing because he claimed that he did not need this program. (N.T. 11/14/18, pg. 63). CUA has attempted to

assist Father with obtaining housing throughout the life of the case. [(*Id.* at 84.)] The CUA case manager offered to provide Father with a referral to a shelter program, but Father voiced his distaste for shelters. [(N.T., 11/14/18, at 90-91).] Father indicated that the CUA case manager offered to refer him to a shelter, but Father chose not to follow up on that referral. (N.T. 11/14/18, pgs. 90-91, 111-112). Father is aware that housing is one of his objectives. (N.T. 11/14/18, pgs. 65-66, 110). Father has been offered appropriate resources to assist him in obtaining appropriate housing, but Father has not completed his housing objective because he has been unwilling to comply with his objective. (N.T. 11/14/18, pgs. 67, 69). Father was referred to the ARC for employment, but Father indicated that he would not present to this program because he believed it would not benefit him. (N.T. 11/14/18, pg. 63). Father admitted that he has not been employed for the past year and that his only income comes from disability. (N.T. 11/14/18, pg. 101, 115). Father's visits with Children were suspended from the time that Children entered into DHS care until June 2018. (N.T. 11/14/18, pgs. 38, 137-138). Father only had two visits with Children before the visits were suspended for a second time on or about August 2018. (N.T. 11/14/18, pgs. 128, 134, 138). Although the visits appeared appropriate between Father and Children, there were significant concerns regarding Children's behavior after they attended visits. (N.T. 11/14/18, pgs. 19-20, 51, 138). Children's progress in their individualized trauma therapy regressed when visits with Father began, but began progressing again after the visits were suspended. (N.T. 11/14/18, pgs. 19-21, 51-52, 133). [R.C.'s] therapist cites the change in [R.C.'s] behaviors and Father's non-compliance with the SCP goals as the basis of not increasing visits between Children and Father. (N.T. 11/14/18, pg. 33). [J.C.'s] therapist also does not recommend any changes to be made to the suspension of visitation between Children and Father due to [J.C.'s] change in behavior when visitation was resumed in June 2018. (N.T. 11/14/18, pgs. 51-52, 133). [J.C.'s] behavior began to improve after the visitation was suspended in August 2018. (N.T. 11/14/18, pgs. 51-52, 133). Father has never participated in caregiver sessions with therapists prior to starting supervised visits again with Children. (N.T. 11/14/18, pgs. 26, 49). Father has been unable to participate in caregiver sessions due to his active significant mental health and substance use issues. Father would have to actively engage in his objectives before he could participate in caregiver sessions. (N.T. 11/14/18, pg. 26). Father has previously indicated that the Family Court,

CUA, and Children's therapists would have to "pay for their acts." Father also once stated, "I would give my life for my children," and "I will also take a life for my children," which indicates a lack of desire of Father to comply with his objectives and presents a safety concern for all parties. Father lacks the emotional stability to parent Children. (N.T. 11/14/18, pgs. 63-64). Father has been non-compliant with his objectives throughout the life of the case. (N.T. 11/14/18, pg. 74). Father has acknowledged that, except for the two visits, he has not complied with the trial court's orders throughout the life of the case. (N.T. 11/14/18, pgs. 110-111). Father admitted that at the time of the termination trial, Father was not ready, willing, and able to care for Children. (N.T. 11/14/18, pgs. 113-114). Father has demonstrated that he is unwilling to provide Children with essential parental care, control, or subsistence necessary for their physical and mental wellbeing. Father has refused to remedy the conditions and causes of Father's incapacity. Father has attended almost all of the court hearings and is aware of his SCP objectives. Father had ample opportunity to put himself in a position to parent. Father's repeated and continued incapacity has not been mitigated. Father refuses to participate in caregiver sessions with therapists to seek the insight to ensure Children's emotional well-being and needs are met. Both children have significant mental health and emotional needs that need to be stabilized. (N.T. 11/14/18, pgs. 25, 28-29. 45-47). Termination under 23 Pa.C.S.A. §2511(a)(2) was also proper.

Trial Court Opinions, J.C. and R.C., 3/15/19, at 8-11.

Although Father claims that he is devoted to the Children and wishes to protect them, **see** N.T., 11/14/18, at 102, 109, this Court has held that a parent's love of his child, alone, does not preclude a termination. **See In re L.M.**, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." **In re Adoption of C.L.G.**, 956 A.2d at 1007, *citing* **In re Z.S.W.**, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that

a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.").

After a careful review of the record, this Court finds the trial court's decision to terminate the parental rights of Father under section 2511(a)(2) is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-827.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993), th[e Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal

citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." **In re K.Z.S.**, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

**In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." **See In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013), *quoting* **In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008). The Supreme Court stated: "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and

neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *See In re T.S.M.*, 71 A.3d at 267, *quoting In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting).

Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

With regard to section 2511(b), the trial court stated as follows:

> Father's visits with Children were suspended from the time that Children entered into DHS care until June 2018. (N.T. 11/14/18, pgs. 38, 137-138). However, in late May 2018, the trial court reinstated Father's visits on a bi-weekly, supervised, line of sight and hearing basis. Father only had two visits with Children before the visits were suspended for a second time on or about August 2018. (N.T. 11/14/18, pgs. 128, 134, 138). Although the visits appeared appropriate between Father and Children, there were significant concerns regarding Children's behavior after they attended visits. (N.T. 11/14/18, pgs. 19-20, 51, 138). Children's progress in their individualized trauma therapy regressed when visits with Father began, but began progressing again after the visits were suspended. (N.T. 11/14/18, pgs. 19-21, 51-52, 133). [R.C.'s] therapist cites the change in [R.C.'s] behaviors and Father's non-compliance with the SCP goals as the basis of not increasing visits between Children and Father. (N.T. 11/14/18,

pg. 33). [J.C.'s] therapist also does not recommend any changes to be made to the suspension of visitation between Children and Father due to [J.C.'s] change in behavior when visitation was resumed in June 2018. [J.C.'s] behavior began to improve after the visitation was suspended in August 2018. (N.T. 11/14/18, pgs. 51-52, 133). Father has never participated in caregiver sessions with Children. (N.T. 11/14/18, pgs. 26, 49). Father has been unable to participate in caregiver sessions with the therapists prior to starting supervised visits with Children due to his active significant mental health and substance use issues. Father would have to actively engage in his objectives before he could participate in caregiver sessions. (N.T. 11/14/18, pg. 26). Father has previously indicated that the Family Court, CUA, and Children's therapists would have to "pay for their acts." Father also once stated, "I would give my life for my children," and "I will also take a life for my children," which indicates a lack of desire of Father to comply with his objectives and presents a safety concern for all parties. Father lacks the emotional and mental health stability to be providing for Children's many needs. (N.T. 11/14/18, pgs. 63-64). Father has been non-compliant with his objectives throughout the life of the case. (N.T. 11/14/18, pg. 74). Father has acknowledged that, except for the two visits, he has not complied with the trial court's orders throughout the life of the case. (N.T. 11/14/18, pgs. 110-111). Children are currently placed together in a foster home. (N.T. 11/14/18, pg. 58). The current foster parent ("Foster Parent") participates in one-on-one caregiver sessions, family therapy, and dyadic work for Children on a weekly basis with Children's respective therapists. (N.T. 11/14/18, pgs. 25, 46). Foster Parent's participation has allowed [J.C.] to work through his interpersonal trauma and allow him to develop a sense of safety and security. (N.T. 11/14/18, pgs. 45-46). Foster Parent has been dedicated to [J.C.'s] care[,] and [J.C.] has been able to utilize her for support. (N.T. 11/14/18, pg. 47). Although Foster Parent has not indicated that she is an adoptive resource, Foster Parent has not provided any timeframe that would limit her ability to provide care to Children and is willing to be a resource for Children for the foreseeable future. (N.T. 11/14/18, pgs. 29-30, 47). [R.C.'s] therapist has observed that [R.C.] and Foster Parent have developed an attachment[,] and [R.C.] feels safe in Foster Parent's care. During some of [R.C.'s] sessions with therapist, Child would appear visibly anxious when Foster Parent left the room and would calm down when Foster Parent returned. (N.T. 11/14/18, pg. 28). [R.C.'s] therapist has also observed that Child

appears to feel safe and secure with Foster Parent. [R.C.] has never shared information about any other adults in her past or present, including Father, that have made her feel safe and secure. (N.T. 11/14/18, pgs. 28-29). Foster Parent has been involved in the educational decision-making for Children. (N.T. 11/14/18, pg. 23). Children have a close bond with Foster Parent. (N.T. 11/14/18, pgs. 53, 79). [J.C.] does not have any type of bond with Father. [(N.T. 11/14/18, pg. 128).] [R.C.] does appear to have some type of relationship with Father, but it is not a child-parent bond that needs to be preserved. [(N.T. 11/14/18, pg. 129-130).] Father's parental bond with Children is very attenuated[,] since Father's visits have been suspended. When the trial court allowed Father to have supervised visits, Children's emotional stability became deregulated, as per the testimony of Children's therapists. Children would not suffer any harm if Father's parental rights were terminated. (N.T. 11/14/18, pgs. 73-74, 128-130). It is in Children's best interest to be freed for adoption. (N.T. 11/14/18, pg. 74). Legal Counsel, along with the Catch agency case worker, [sic] met with Children and had the chance to observe them. Child 1 was four-years-old [sic] and Child 2 was six-years-old [sic] at the time of the termination trial. When Legal Counsel and the Catch agency case worker visited Children, Children indicated that they wanted to remain with Foster Parent and never expressed a desire to return to Father's care. (N.T. 11/14/18, pgs. 143-145). Legal Counsel recommended that [Children] remain with Foster Parent for as long as they can. (N.T. 11/14/18, pg. 153). The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Father. The DHS witnesses were credible. The trial court's termination of Father's parental rights to Children under 23 Pa.C.S.A. §2511(b) was proper and there was no error of law or an abuse of discretion.

Trial Court Opinions, J.C. and R.C., 3/15/19, at 19-21.

We find no merit to the arguments in the **Anders** brief that the trial court misheard and misinterpreted bonding evidence; improperly concluded there was a nexus between Father's transience/financial instability and any inability to parent; and erroneously determined that despite further assistance, Father would not have been able to remedy the dependent issues.

- 21 -

After a careful review of the record, this Court finds the trial court's decision to terminate the parental rights of Father under section 2511(a)(2) and (b) is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-827.

Next, with regard to the "reasonable efforts" issue raised in the *Anders* brief, our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. *See In the Interest of: D.C.D., a Minor*, 105 A.3d 662, 672-674, 676 (Pa. 2014) (rejecting the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights, and rejecting the suggestion that section 2511 of the Adoption Act should be read in conjunction with section 6351 of the Juvenile Act, particularly section 6351(f)(9)(iii)). Thus, based on our Supreme Court's holding in *In the Interest of: D.C.D., a Minor*, we find no merit to the argument that DHS failed to use reasonable efforts before seeking the termination of Father's parental rights to the Children in this matter.

Next, we address whether the trial court committed an abuse of discretion in changing the Children's permanency goal to adoption.

The Pennsylvania Supreme Court set forth our standard of review in a dependency case as follows.

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of

the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

***In Interest of: L.Z.***, ***A Minor Child***, 111 A.3d 1164, 1174 (Pa. 2015).

With regard to a dependent child, in ***In re D.A.***, 801 A.2d 614 (Pa. Super. 2002) (*en banc*), this Court explained:

> [A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

***Id.*** at 617.

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Section 6351(e) of the Juvenile Act provides in pertinent part:

**(e) Permanency hearings.—**

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the

child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. . . .

* * *

42 Pa.C.S. § 6351(e).

Section 6351(f) of the Juvenile Act prescribes the pertinent inquiry for

the reviewing court:

**(f) Matters to be determined at permanency hearing.-**

At each permanency hearing, a court shall determine all of the following:

(1)     The continuing necessity for and appropriateness of the placement.

(2)     The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3)     The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)     The appropriateness and feasibility of the current placement goal for the child.

(5)     The likely date by which the placement goal for the child might be achieved.

(5.1)    Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)     Whether the child is safe.

(7)     If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

* * *

**(f.1) Additional determination.** — Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and wiling relative.

**(f.2) Evidence. –** Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.— On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.**

\* \* \*

42 Pa.C.S. § 6351 (some emphasis added).

With regard to the goal change, the trial court stated as follows:

Father's SCP [Single Case Plan] objectives were to attend the CEU [Clinical Evaluation Unit] for drug screens and an evaluation, mental health, housing, employment, and supervised visitation. (N.T. 11/14/18, pgs. 61, 63, 68, 137). Father's objectives have remained the same[,] and Father has attended most hearings. (N.T. 11/14/18, pgs. 65, 89, 100). Father had a scheduled assessment at the CEU on October 31, 2017, but Father failed to attend. Father's drug and alcohol screen was negative on October 10, 2017. (N.T. 11/14/18, pg. 13; DHS Exhibit 3). Father has not completed any random drug screens throughout the case. The CUA case manager testified that during the life of the case, Father was asked to complete random drug screens, but he never complied. (N.T. 11/14/18, pg. 141). When the CUA case manager spoke with Father about completing random drug screens, Father indicated that he did not want to travel to Center City Philadelphia to complete the drug screens. (N.T. 11/14/18, pgs. 68-69). Father admitted that he did not attend the random drug screens, citing lack of funds and stating that he has never used drugs. (N.T. 11/14/18, pgs. 89, 100-101, 111). Father admitted that he never asked for transportation assistance to attend the random drug screens. (N.T. 11/14/18, pg. 101). Father acknowledged that he knew that the trial court ordered him to complete random drug screens. (N.T. 11/14/18, pgs. 100, 110). Father has not provided any verification that he has complied with any mental health assessment or treatment. (N.T. 11/14/18, pg. 68). Father was aware that the trial court ordered him to complete a mental health evaluation. (N.T. 11/14/18, pgs. 93, 110). Even though CUA and DHS discussed the mental health evaluation with Father on multiple occasions, Father admitted that he never received an evaluation. (N.T. 11/14/18, pg. 93). Father indicated that he received a mental health evaluation when he lived in Kentucky before this case began, but stated that he lost all of his paperwork reflecting that information. (N.T. 11/14/18, pg. 94). As part of Father's objective to receive mental health treatment, Father was ordered to engage in public assistance and receive a state identification card. Father never visited the public assistance office and does not have a state identification card. When asked if Father had any plans on visiting the public assistance office or obtaining a state identification card, Father stated that he would do so "later on down the road." (N.T. 11/14/18, pgs. 92-93). Father's failure to engage with public assistance is a barrier to Father's ability to receive mental health services. There are still concerns regarding Father's significant mental health issues. (N.T. 11/14/18, pg. 55). Father has not completed his drug and

alcohol or mental health objective. (N.T. 11/14/18, pg. 69). Father has indicated to the CUA case worker [sic] that he resides in Pennypack Park, a public city park in Philadelphia. (N.T. 11/14/18, pgs. 59-60, 86). At the bar of the court, Father indicated that he does not live in Pennypack Park, but that he lives on a "concrete slab" with no mailing address. (N.T. 11/14/18, pg. 88). Father has indicated to the CUA case manager that he had no intention of presenting to the ARC for housing because he claimed that he did not need this program. (N.T. 11/14/18, pg. 63). CUA has attempted to assist Father with obtaining housing throughout the life of the case. [(*Id.* at 84.)] The CUA case manager offered to provide Father with a referral to a shelter program, but Father voiced his distaste for shelters. [(*Id.* at 90-91.)] Father indicated that the CUA case manager offered to refer him to a shelter, but Father chose not to follow up on that referral. (N.T. 11/14/18, pgs. 90-91, 111-112). Father is aware that housing is one of his objectives. (N.T. 11/14/18, pgs. 65-66, 110). Father has been offered appropriate resources to assist him in obtaining appropriate housing. Father has not completed his housing objective because he has been unwilling to comply with this objective. (N.T. 11/14/18, pgs. 67, 69). Father was referred to the ARC for employment, but Father indicated that he would not present to this program because he believed it would not benefit him. (N.T. 11/14/18, pg. 63). Father admitted that he has not been employed for the past year and that his only income comes from disability. (N.T. 11/14/18, pg. 101, 115). Father's visits with Children were suspended from the time that Children entered into DHS care until June 2018. (N.T. 11/14/18, pgs. 38, 137-138). However, in late May 2018, the trial court reinstated bi-weekly supervised line of sight and hearing visits. Father only had two visits with Children before the visits were suspended for a second time on or about August 2018. (N.T. 11/14/18, pgs. 128, 134, 138). Although the visits appeared appropriate between Father and Children, there were significant concerns regarding Children's behavior after they attended visits. (N.T. 11/14/18, pgs. 19-20, 51, 138). Children's progress in their individualized trauma therapy regressed when visits with Father began, but began progressing again after the visits were suspended. (N.T. 11/14/18, pgs. 19-21, 51-52, 133). [R.C.'s] therapist cites the change in [R.C.'s] behaviors and Father's noncompliance with the SCP goals as the basis of not increasing visits between Children and Father. (N.T. 11/14/18, pg. 33). [J.C.'s] therapist also does not recommend any changes to be made to the suspension of visitation between Children and Father

due to [J.C.'s] change in behavior when visitation was resumed in June 2018. [J.C.'s] behavior began to improve after the visitation was suspended in August 2018. (N.T. 11/14/18, pgs. 51-52, 133). Father has never participated in caregiver sessions with Children. (N.T. 11/14/18, pgs. 26, 49). Father has been unable to participate in caregiver sessions with the therapists prior to starting supervised visits with Children due to his active significant mental health and substance use issues. Father would have to actively engage in his objectives before he could participate in caregiver sessions. (N.T. 11/14/18, pg. 26). Father has previously indicated that the Family Court, CUA, and Children's therapists would have to "pay for their acts." Father also once stated, "I would give my life for my children," and "I will also take a life for my children," which indicates a lack of desire of Father to comply with his objectives and presents a safety concern for all parties. Father lacks the emotional and mental health stability to provide for Children's many needs. (N.T. 11/14/18, pgs. 63-64). Father has been non-compliant with his objectives throughout the life of the case. (N.T. 11/14/18, pg. 74). Father has acknowledged that, except for visitation, he has not complied with the trial court's orders throughout the life of the case. (N.T. 11/14/18, pgs. 110-111). Children are currently placed together in a foster home. (N.T. 11/14/18, pg. 58). The current foster parent ("Foster Parent") participates in one-on-one caregiver sessions, family therapy, and dyadic work for Children on a weekly basis with Children's respective therapists. (N.T. 11/14/18, pgs. 25, 46). Foster Parent's participation has allowed [J.C.] to work through his interpersonal trauma and allow him to develop a sense of safety and security. (N.T. 11/14/18, pgs. 45-46). Foster Parent has been dedicated to [J.C.'s] care and [J.C.] has been able to utilize her for support. (N.T. 11/14/18, pg. 47). Although Foster Parent has not indicated that she is an adoptive resource, Foster Parent has not provided any timeframe that would limit her ability to provide care to Children and is willing to be a resource for Children for the foreseeable future. (N.T. 11/14/18, pgs. 29-30, 47). [R.C.'s] therapist has observed that [R.C.] and Foster Parent have developed an attachment and Child [1] feels safe in Foster Parent's care. During some of [R.C.'s] sessions with therapist, [R.C.] would appear visibly anxious when Foster Parent left the room and would calm down when Foster Parent returned. (N.T. 11/14/18. pg. 28). [R.C.'s] therapist has also observed that [R.C.] appears to feel safe and secure with Foster Parent. [R.C.] has never shared information about any other adults in her past or present, including Father, that have made her feel safe and

secure. (N.T. 11/14/18, pgs. 28-29). Foster Parent has been involved in the educational decision-making for Children. (N.T. 11/14/18, pg. 23). Children have indicated that they want to continue living with Foster Parent and neither child has ever asked to be reunified with Father. (N.T. 11/14/18, pgs. 144-145). Any bond or relationship of Father with Children is attenuated since Father's visits have been suspended. When the trial court allowed Father to have supervised visits, Children's emotional stability became deregulated, as per the testimony of Children's therapists. The DHS witnesses were credible. The record established by clear and convincing evidence that the court's change of Children's permanency goal from reunification to adoption was proper. Children need permanency, and Father admitted that at the time of the termination trial, Father was not ready, willing, and able to care for Children. (N.T. 11/14/18, pgs. 113-114). Children need to be stable emotionally and consistently attend their many therapeutic services. Consequently, it is in their best interests to remain with Foster Parent in the same home. The trial court did not err or abuse its discretion when it changed Children's permanency goal from reunification to adoption.

Trial Court Opinion, 3/15/19, at 21-26.

Our review of the record demonstrates that there is sufficient, competent evidence in the record that supports the trial court's factual and credibility determinations. Thus, we will not disturb the trial court's decision. *In re Adoption of S.P.*, 47 A.3d at 826-827. Accordingly, we affirm the trial court's decrees terminating Father's parental rights to the Children pursuant to section 2511(a)(2) and (b) of the Adoption Act, as well as the orders changing the Children's permanency goal to adoption.

Decrees and orders affirmed. Motion to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/1/19</u>